In re FORD MOTOR CO. BRONCO
II PRODUCTS LIABILITY
LITIGATION.

Civ. A. No. MDL–991.

United States District Court,
E.D. Louisiana.

Nov. 13, 1995.

Order Denying Reconsideration
Dec. 13, 1995.

Colvin Gamble Norwood, Jr., Mark N. Bodin, McGlinchey, Stafford & Lang, New Orleans, LA, John H. Beisner, O'Melveny & Myers, Washington, DC, for Ford Motor Co. Bronco II.

Jack M. Weiss, Mark Benjamin Holton, Stone, Pigman, Walther, Wittmann & Hutchinson, LLP, New Orleans, LA, for Dow Jones & Company Inc.

Jack M. Weiss, Mark Benjamin Holton, Stone, Pigman, Walther, Wittmann & Hutchinson, LLP, New Orleans, LA, for Milo Geyelin.

Patricia Howard, Washington, DC, Pro se.

### MEMORANDUM AND ORDER

SEAR, Chief Judge.

*Background*

Between June 23 and August 26, 1993, six consumer class actions [1] were filed asserting claims that 1983–1990 model year Ford Bronco II vehicles have design defects. On February 9, 1994, the Judicial Panel on Multidistrict Litigation consolidated and transferred the five pending federal actions to this court for pretrial proceedings pursuant to 28 U.S.C. § 1407. Another consumer class action, *Roy L. Washington v. Ford Motor Company*, C.A. No. 95–1676, was consolidated with the captioned litigation on August 3, 1995, and thus is a "tag-along" action.

On July 25, 1994, plaintiffs filed a Consolidated Amended Class Action Complaint ("Plaintiffs' Complaint") asserting claims based upon an alleged design defect in the Ford Bronco II that makes the vehicle unduly prone to roll over. Plaintiffs alleged therein that Ford knowingly failed and/or refused to correct the Bronco II's rollover problem and fraudulently concealed the prob-

lem from the public. They further alleged that Ford fraudulently advertised the Bronco II as a high quality vehicle free of dangerous defects. Plaintiffs asserted eleven different causes of action including federal claims under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1), and the Magnuson–Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*, and state law claims for fraud, misrepresentation, breach of express and implied warranty, breach of contract, strict liability, and negligence. Plaintiffs also asserted claims under the Product Liability Acts and Unfair Trade Practices Statutes of each jurisdiction and the Louisiana doctrine of redhibition, La.C.C. arts. 2520, *et seq.*

By Memorandum and Order dated August 15, 1995, I addressed Ford's Motion to Dismiss all the claims asserted in the five constituent actions transferred to this court on February 9, 1994. I dismissed the following claims with prejudice: plaintiffs' claims under the Lanham Act; plaintiffs' claims for violation of the Products Liability Acts and Unfair Trade Practices Act of each state, the District of Columbia and the Commonwealth of Puerto Rico; plaintiffs' state law claims for negligence and strict liability; plaintiffs' Florida state law claims for fraud and misrepresentation; plaintiffs' Louisiana state law claims for breach of express warranty, implied warranty and breach of contract; and plaintiffs' Mississippi, North Carolina and Florida state law breach of implied warranty claims.

Further, I dismissed the following claims without prejudice and with leave to amend: plaintiffs' claims under the Magnuson–Moss Act; plaintiffs' Louisiana, North Carolina and Mississippi state law claims for fraud and misrepresentation; plaintiffs' Mississippi and North Carolina state law claims for breach of implied warranty of fitness; plaintiffs' North Carolina state claims for breach of contract; and plaintiffs' Louisiana state law claims for redhibition.

---

[1]. Five of the actions were federal actions: *Bates, et al. v. Ford Motor Company; Luis, et al. v. Ford Motor Company; Lewis, et al. v. Ford Motor Company; Armistead, et al. v. Ford Motor Company; Vitrano, et al. v. Ford Motor Company; Bates, et al. v. Ford Motor Company;* and *Luis, et al. v. Ford Motor Company.*

The sixth action was a state court action: *Rice, et al. v. Ford Motor Company.*

Finally, I denied Ford's motion to dismiss the following claims: plaintiffs' Mississippi, North Carolina, and Florida state law claims for breach of express warranty; plaintiffs' Florida state law claims for general breach of implied warranty; and plaintiffs' Mississippi and Florida state law claims for breach of contract.

On September 26, 1995, plaintiffs filed a Second Consolidated and Amended Class Action Complaint ("the Second Complaint"). By the Second Complaint, plaintiffs assert claims for fraud, breach of express warranty, breach of implied warranty of merchantability, breach of contract, redhibition, and violation of the Magnuson–Moss Warranty Act.[2] Plaintiffs seek a variety of equitable and damages relief, including repayment of the Bronco II purchase price, compensation for diminution in the value of the Bronco II, and/or an injunction requiring Ford to provide public notice that the Bronco II contains a latent, dangerous defect or to recall or retrofit all Bronco IIs. Plaintiffs also seek punitive damages, attorneys' fees, and costs. With respect to each of their claims, plaintiffs have sought to correct the deficiencies discussed in the August 15, 1995 Memorandum and Order. Plaintiffs also have named one hundred twenty (120) additional plaintiffs, bringing into play the laws of five more states: Indiana, Minnesota, New York, Texas and West Virginia.

Ford now moves for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), seeking dismissal of plaintiffs' claims on grounds that they are preempted[3] by the National Traffic and Motor Vehicle Safety Act of 1966, 15 U.S.C. §§ 1381–1431 ("Safety Act" or "Act").[4] Specifically, Ford asserts that plaintiffs' state common law claims are impliedly preempted under the Safety Act because The National Highway Traffic Safety Administration ("NHTSA" or "Agency"), the federal agency charged with promulgating uniform nationwide vehicle safety and information standards under the Safety Act, has determined that stability regulation of light utility vehicles is unwarranted. Plaintiffs oppose the motion.

*Analysis*

## I. Standard Under Federal Rule of Civil Procedure 12(c)

A motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) is subject to the same standard as a Rule 12(b)(6) motion to dismiss.[5] Accordingly, all well-pleaded material allegations are taken as true and the complaint is viewed in the light most favorable to the pleader.[6] The court should not dismiss the complaint unless it appears beyond doubt that plaintiff can prove no set of facts that would entitle him to relief.

As when considering a Rule 12(b)(6) motion, the court's review is limited to the pleadings. However, reference to documents outside the pleadings is permitted in certain instances, as when documents are expressly incorporated into the pleadings or are referred to in the complaint and are central to plaintiffs' claims.[7] Also, the court may take judicial notice of matters of public record.[8]

## II. Federal Preemption Doctrine

 The Supremacy Clause, Article VI, cl. 2 of the United States Constitution, serves as the basis for Congress' power to preempt

---

**2.** The relief sought by plaintiffs is the same. *See* fn. 2 supra.

**3.** Ford first filed its preemption motion on July 26, 1995, and renewed the motion on October 13, 1995, following the filing of the Second Complaint.

**4.** Recodified in 1994, without substantive change, at 49 U.S.C. § 30101 *et seq.*

**5.** 5A C. Wright & A. Miller, *Federal Practice and Procedure* § 1368 (West 2d ed. 1990 & Supp. 1995).

**6.** *St. Paul Ins. Co. v. AFIA Worldwide Ins. Co.,* 937 F.2d 274, 279 (5th Cir.1991).

**7.** C. Wright & A. Miller, *Federal Practice and Procedure* §§ 1327, 1371 (West 2d ed. 1990).

**8.** *Id.* § 1367; *Louisiana ex rel Guste v. United States,* 656 F.Supp. 1310, 1314 n. 6 (W.D.La. 1986).

state law.[9] The single most important factor to consider in any preemption analysis is the intent of Congress.[10] The Supreme Court, however, has cautioned lower courts to "start with the assumption that the historic police powers of the states [are] not to be superseded by [a] federal act unless that was the clear and manifest purpose of Congress."[11] That is, preemption is not to be lightly presumed and any doubt as to congressional purpose should be resolved against preemption, "for the state[s] [are] powerless to remove the ill effects of [a] decision, while the national government, which has the ultimate power, remains free to remove the burden."[12]

■ The Supreme Court has recognized three categories of preemption:

Congress' intent may be 'explicitly stated in the statute's language or implicitly contained in its structure or purpose.' In the absence of an express congressional command, state law is preempted if that law actually conflicts with federal law, or if federal law so thoroughly occupies a legislative field 'as to make reasonable the inference that Congress left room for the States to supplement it.'[13]

More succinctly stated, the three types of preemption are (1) express; (2) occupation-of-the-field; and (3) conflict. Insofar as neither occupation-of-the-field nor conflict are explicitly stated in a statute's language, both of these are forms of "implied" preemption.[14]

■ Ford relies on the concept of implied conflict preemption in seeking dismissal of plaintiffs' claims. Conflict preemption occurs when Congress has not necessarily ex-pressed its intent to preempt state regulation in a particular field, but the state law in question conflicts or is otherwise impermissibly inconsistent with the applicable federal statute or regulation. According to the Supreme Court, such a conflict arises when "compliance with both federal and state regulation is a physical impossibility or the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."[15] The conflict between state and federal law must be concrete and immediate. "The existence of a hypothetical or potential conflict is insufficient to warrant the preemption of a state statute ... [or] regulatory scheme."[16]

■ The Supreme Court has emphasized that conflict preemption analysis "must be applied sensitively ... to prevent the diminution of the role Congress reserved to the States while at the same time preserving the federal role."[17] Clearly, an express statement is preferable to implication, and there is more of a general hesitancy to infer preemptive intent than to find preemption when Congress has expressly stated its intent.[18] While there is no categorical rule that implied (conflict) preemption cannot exist when Congress has chosen to include an express preemption clause in a statute, congressional intent is the touchstone of any preemption analysis and therefore, to the extent that an express preemption clause provides 'a reliable indicium of congressional intent with respect to state authority,' it may, in a given case, weigh strongly against a

9. *Louisiana Public Service Commission v. FCC*, 476 U.S. 355, 368–69, 106 S.Ct. 1890, 1898, 90 L.Ed.2d 369 (1986).

10. *California Federal Savings & Loan Association v. Guerra*, 479 U.S. 272, 280, 107 S.Ct. 683, 688, 93 L.Ed.2d 613 (1987).

11. *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947).

12. *Penn Dairies v. Milk Control Commission*, 318 U.S. 261, 275, 63 S.Ct. 617, 624, 87 L.Ed. 748 (1943).

13. *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407 (1992) (citations omitted).

14. *Hillsborough County, Florida v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985).

15. *Guerra*, 479 U.S. at 280, 107 S.Ct. at 689.

16. *Rice v. Norman Williams Co.*, 458 U.S. 654, 659, 102 S.Ct. 3294, 3299, 73 L.Ed.2d 1042 (1982).

17. *Northwest Central Pipeline Corp. v. State Corp. Comm'n of Kansas*, 489 U.S. 493, 517, 109 S.Ct. 1262, 1277, 103 L.Ed.2d 509 (1989).

18. *Perry v. Mercedes Benz of North America, Inc.*, 957 F.2d 1257, 1261 (5th Cir.1992).

finding of implied preemption.[19]

### III. The Safety Act

Congress enacted the Safety Act in 1966 "to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents."[20] The Act directs the Secretary of Transportation to promulgate "appropriate federal motor vehicle safety standards."[21] Such standards are defined by the Act as "minimum standard[s] for motor vehicle performance, or motor vehicle equipment performance, which is practicable, which meets the need for motor vehicle safety and which provides objective criteria."[22] The Secretary has delegated the authority to promulgate safety standards to the Administrator of the National Highway Traffic Safety Administration ("NHTSA" or "Agency").

▮ In addition to the statement of purpose provision, two other provisions of the Act bear specifically on Congress' power to ensure uniformity through preemption. The Act contains an express preemption provision that prohibits nonidentical state regulations when a federal standard addresses the same aspect of performance. That clause provides as follows:

> Whenever a Federal motor vehicle standard established under this subchapter is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any motor vehicle or item of motor vehicle equipment any safety standard applicable to the same aspect of performance of such vehicle or item of equipment which is not identical to the Federal standard. Nothing in this section shall be construed as preventing any State from

enforcing any safety standard which is identical to a Federal safety standard.[23] Thus, states may enforce safety standards that are identical to federal standards and may also regulate aspects of performance that federal safety standards do not specifically cover.

The Act also contains a savings clause that appears to preserve common law remedies against automobile manufacturers. According to this provision, "[c]ompliance with any Federal motor vehicle safety standard issued under this subchapter does not exempt any person from any liability under common law."[24]

Defendant has placed at issue the NHTSA's action and/or inaction under the Safety Act with respect to stability standards for light utility vehicles like the Ford Bronco II. As early as 1973, the Agency began investigating the need for standards related to the tendency of motor vehicles to roll over.[25] In 1982, the Agency issued a notice of proposed rulemaking for adoption of a new consumer information regulation on the propensity of utility vehicles to rollover.[26] The final rule adopting the amendment was issued in May 1984, requiring manufacturers of utility vehicles to alert owners, through a vehicle sticker and the owner's manual, to the vehicles' special handling and maneuvering characteristics and to warn owners of the danger of rollover.[27] In taking this action, the agency recognized that the lack of consumer awareness was only part of the problem, but decided that, based on the findings to date, a consumer information regulation was the most cost effective manner of handling the situation.[28]

In December 1987 the NHTSA denied a rulemaking petition from then Congressman

---

19. *Freightliner Corp. v. Myrick*, —— U.S. ——, ——————, 115 S.Ct. 1483, 1487–88, 131 L.Ed.2d 385 (1995) (*citing Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 517–18, 112 S.Ct. 2608, 2618, 120 L.Ed.2d 407 (1992)).

20. 15 U.S.C. § 1381.

21. *Id.* § 1392(a).

22. *Id.* § 1391(2).

23. *Id.* § 1392(d).

24. *Id.* § 1397(k).

25. 57 Fed.Reg. 242, 244 (1992).

26. 47 Fed.Reg. 58323 (1982).

27. 49 Fed.Reg. 20016 (1984); 49 C.F.R. § 575.105.

28. 49 Fed.Reg. at 20018.

Timothy E. Wirth that requested NHTSA to require that the "stability factor"[29] of light duty vehicles exceed a specified minimum value.[30] The Agency found that establishing a single minimum stability standard would not adequately encompass the causes of vehicle rollover or completely alleviate the problem, and therefore deferred any consideration of rulemaking on vehicle rollover characteristics until it could complete its ongoing and comprehensive research program on vehicle stability and rollover.[31] The Agency specifically noted that it in no way "intended to imply that the stability factor has an insignificant role in rollover involvement;" it simply desired to consider all of the factors which contributed to the rollover problem before taking further regulatory action.[32]

In September 1988 NHTSA granted a petition for rulemaking filed by the Consumers Union requesting the establishment of a minimum stability standard to protect against unreasonable risk of rollover, pursuant to its ongoing research efforts. In January 1992 the Agency issued an advance notice of proposed rulemaking advising that it was considering various forms of regulatory action to reduce casualties associated with the rollover of passenger cars, pickup trucks, vans and utility vehicles, including improved vehicle stability, improved crashworthiness, and consumer information on rollover propensity.[33] In this notice, the Agency explained its previous efforts in this area, briefly outlined the nature of its ongoing research, and invited public comment.

In June 1994 the Agency issued a notice of proposed rulemaking with regard to a new consumer information regulation and terminated rulemaking with regard to a proposed minimum "stability" safety standard.[34] As an initial matter, the Agency again noted that rollover crashes of passenger cars, trucks and utility vehicles occurred for many reasons, including the driver, the roadway, the vehicle and environmental conditions.[35] According to the Agency, "no single type of rulemaking or other agency action could solve all, or even a majority of, the problems associated with rollover."[36]

In the June 1994 notice, the Agency explained that, based on its extensive research and testing to date, it had found a correlation between several identified vehicle metrics (including stability-related factors) and the propensity of vehicles to roll over. The Agency decided, however, not to recommend adoption of a uniform stability standard at this time because the great majority of rollover fatalities (which occur in passenger cars) would be unaffected by such a standard[37] and there was no cost effective manner of imposing such a standard.[38] According to the Agency, it was "deferring any further action on this subject until such time as information becomes available demonstrating the cost effectiveness of such a rule."[39]

Although it deferred proposing a stability standard, the Agency's continuing concern about the rollover problem prompted it to propose a new consumer information regulation. The Agency "believe[d] that the correlation between stability and rollover risk is significant enough to justify [such] a consumer information regulation to relieve the possibility of uninformed risk."[40] The consumer information regulation proposed by the Agency, which purportedly will go into effect in some form in January 1996, requires man-

29. The stability factor, also referred to as the "static stability factor," represents an approximation, assuming that the vehicle is a rigid body, of the steady state lateral acceleration at which a vehicle will roll over. *See* 57 Fed.Reg. 242, 244 (1992).

30. 52 Fed.Reg. 49033 (1987).

31. 52 Fed.Reg. at 49037.

32. 52 Fed.Reg. at 49036.

33. 57 Fed.Reg. 242 (1992).

34. 59 Fed.Reg. 33254 (1994).

35. 59 Fed.Reg. at 33254.

36. 59 Fed.Reg. at 33255.

37. 59 Fed.Reg. at 33262.

38. 59 Fed.Reg. at 33257, 33262.

39. 59 Fed.Reg. at 33258.

40. 59 Fed.Reg. at 33258.

ufacturers of passenger cars and light trucks to label their vehicles with information relating to rollover stability, so that consumers may make informed choices in purchasing and operating such vehicles.[41]

## IV. Preemption in this Case

Ford maintains that plaintiffs' state law claims are preempted because to impose common law liability on automobile manufacturers stands as an obstacle to the accomplishment of a federal policy of non-regulation of vehicle stability. Ford relies on the history of NHTSA activity in this area to argue that NHTSA has made a "conscious determination" to reject any role for utility vehicle stability standards and has exhibited "a consistent adherence to non-regulation" which has the "character of a ruling" of non-regulation. Ford maintains that NHTSA's election of a consumer information remedy further buttresses the inference that the prevailing policy is one of non-regulation. Finally, Ford argues, plaintiffs' state law claims are not preserved by the savings clause because the sole purpose of that clause is to prevent manufacturers from using compliance with federal standards as an affirmative defense.

Plaintiffs oppose Ford's motion on grounds that (1) there is no definitive federal standard for purposes of implied preemption; (2) assuming there is a definitive standard, there is no actual conflict between that standard and plaintiff's claims; and (3) Congress intended, by the savings clause, to preserve common law claims against automobile manufacturers.

It bears noting, at the outset, that the preemption scenario relied on by Ford, though tenable, is the most nebulous possible setting for a finding of preemption. First, Ford relies not on any actual, written safety standard promulgated under the Safety Act, but on the **absence** of agency action which Ford contends has the "character" of a policy or ruling of non-regulation. Second, the allegedly conflicting state standard likewise is not an actual, written safety standard or regulation, but rather a common law action for damages. Finally, the existence of an express preemption clause that does not mention common law claims, coupled with a savings clause that appears to preserve such claims, provides fairly reliable indicium of congressional intent not to preempt such claims by expression or implication.

## A. Agency's Inaction as a "Standard"

Ford contends that the Agency's failure to propose a uniform stability standard for light utility vehicles has the character of a ruling that no such regulation, in any form, is appropriate and that the Agency has rejected any role for stability standards in the prevention of rollovers. The Supreme Court has recognized that "a federal decision to forego regulation in a given area may imply an authoritative federal determination that the area is best left unregulated, and in that event would have as much pre-emptive force as a decision to regulate."[42] To find congressional intent to preempt state regulation based on an agency's failure affirmatively to exercise its full authority, the failure to regulate must "take on the character of a ruling that no such regulation is appropriate or approved pursuant to the policy of the [federal] statute."[43] Moreover, under the Safety Act, such a decision not to regulate must be such as to satisfy the statutory criteria of being a "minimum" and "objective" standard.[44]

I have reviewed, *inter alia*, the Safety Act's language, legislative history and purpose, as well as the NHTSA's action and inaction under the Act. The purpose of the Act is to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents.[45] To achieve this end, the Secre-

---

**41.** 59 Fed.Reg. at 33258, 33266.

**42.** *Arkansas Elec. Co-op v. Arkansas Pub. Serv. Comm'n*, 461 U.S. 375, 384, 103 S.Ct. 1905, 1912, 76 L.Ed.2d 1 (1983) (citations omitted).

**43.** *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 178, 98 S.Ct. 988, 1004, 55 L.Ed.2d 179 (1978) (citations omitted).

**44.** *Freightliner Corp. v. Myrick*, —— U.S. at ——, 115 S.Ct. at 1484.

**45.** 15 U.S.C. § 1381.

tary of Transportation (and the NHTSA, by delegation) is authorized to promulgate "**appropriate** federal motor vehicle safety standards,"[46] which are defined as "**minimum standard[s]** for motor vehicle performance, or motor vehicle equipment performance, **which is practicable,** which meets the need for motor vehicle safety and **which provides objective criteria.**"[47]

The NHTSA has conducted ongoing and extensive research into the causes of vehicle rollover. That research has been broad, encompassing not only rollover accidents involving utility vehicles, but many types of vehicles, including passenger vehicles. That the Agency has deferred proposing a uniform stability standard suggests to me not that the Agency has adopted a policy of non-regulation, but that its investigation and efforts are ongoing. Most recently, the Agency terminated rulemaking concerning stability standards; however, the Agency also advised that its findings should in no way be taken to reject or discount stability factors as a cause of vehicle rollovers. Indeed, the Agency has repeated this disclaimer each time it has spoken on the issue. Instead, as the Agency has explained, its choice not to adopt a minimum stability standard has been based largely on cost-benefit considerations and the breadth of its research. A consumer information standard simply is the most "**appropriate**" standard for which the Agency can provide "**objective criteria**" at this time, and is the **minimum** effort the Agency recognizes as preventive of rollover accidents in all types of vehicles.

I find it difficult to see how the language, legislative history, and purpose of the Safety Act, considered in conjunction with the Agency's explanations for forgoing uniform stability regulation at this time, can be viewed as a *definitive* standard prohibiting *any and all* regulation of stability factors. Instead, the lack of a federal standard has resulted from the Agency's decision that it has not compiled sufficient evidence at this time, from a cost-benefit perspective, to justify a singly, uniform stability standard. The absence of regulation cannot constitute regulation in this instance.

### B. No Conflict Between Standard and Claims

Obviously, if there is no federal standard there is nothing with which plaintiffs' claims can conflict. However, even assuming that the NHTSA's failure to regulate stability standards in vehicles constitutes a standard of non-regulation, it is not clear that plaintiffs' common law claims conflict with such a standard so as to be implicitly preempted.

Ford maintains that the upshot of plaintiffs' claims is that the Ford Bronco II has a design defect and that the relief sought by plaintiffs is recall and/or retrofitting of the vehicles. According to Ford, this remedy "stands as an obstacle to the accomplishment and execution of [Congress'] full purposes and objectives" and, therefore, plaintiffs' claims are implicitly preempted.

First, although plaintiffs' claims do involve allegations of design defect, plaintiffs refer broadly to a "propensity to rollover" and do not limit the cause of that problem to stability factors. Second, plaintiffs allege that consumers were misinformed about the rollover problem, regardless of its cause, and thereby were prevented from making considered purchasing and operating decisions.[48] Finally, the relief sought by plaintiffs is not limited to recall and retrofitting; they also seek damages and equitable remedies other than recall. That Ford might choose to respond to plaintiffs' claims or any damages awards by recalling all Bronco IIs is too tenuous a reed on which to find a conflict.

Even if the position taken by the Agency could be said to foreclose the actual adoption of minimum stability standards by the states,

---

**46.** *Id.* § 1392(a) (emphasis added).

**47.** *Id.* § 1391(2) (emphasis added).

**48.** Indeed, if the most recently proposed consumer information standard were retroactive in effect, which it is not, there may be a preemption argument with regard to what information automobile manufacturers may be compelled to provide under state law. But I fail to see how plaintiffs allegations of misinformation conflict with a purported policy of non-regulation of stability standards.

I cannot see how it forecloses all common law actions for damages caused by the propensity of a certain vehicle to rollover. Government regulations provide uniform performance requirements to deter manufacturers from marketing defectively designed products. Design defect litigation, because it is fact intensive, insulated from the political process, and capable of responding to rapid technological advances, provides more individualized remedies for harm caused by defective designs. Thus, whereas the NHTSA may have found it impossible, from a cost and benefit standpoint and based on the breadth of its research, to propose a uniform stability regulation at this time, litigation may be better suited to the task of assessing individual types of vehicles and incidents. Contrary to Ford's argument, it is not clear that this is not, in fact, what Congress had in mind when it included the "savings clause" in the Safety Act.[49]

Accordingly, I fail to see how allowing this litigation to go forward will stand as an obstacle to the accomplishment and execution of the full purposes and objectives of the Safety Act and any regulations thereunder.

For the foregoing reasons, plaintiffs claims are not preempted by federal law.

Accordingly,

IT IS ORDERED that Ford's motion for judgment on the pleadings IS DENIED.

### MEMORANDUM AND ORDER ON RECONSIDERATION

By Memorandum and Order entered on November 13, 1995, I ruled on Ford Motor Company's ("Ford") Motion to Dismiss on grounds that plaintiffs' claims were preempted by the National Traffic and Motor Vehicle Safety Act of 1966, 15 U.S.C. §§ 1381–1431 ("Safety Act"), denying the motion.[1] On November 28, 1995, Ford filed a Motion for Reconsideration or, in the Alternative, for Leave to Seek Appellate Review Pursuant to 28 U.S.C. § 1292(b) of the Court's ruling on Ford's Motion to Dismiss.

The Fifth Circuit recognizes that a motion to reconsider a dispositive pre-trial motion, including a motion to dismiss, is analogous to a motion to "alter or amend the judgment" under Rule 59(e) of the Federal Rules of Civil Procedure or a motion for "relief from judgment" under Rule 60(b). *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 173 (5th Cir.1990); *Charles L.M. v. Northeast Indep. School Dist.*, 884 F.2d 869 (5th Cir.1989). A motion for reconsideration is considered a Rule 59(e) motion if it is served within ten days of the rendition of the judgment; if it is served after that time, it falls under Rule 60(b). *Id.* Because Ford served its motion for reconsideration within ten days of entry of the court's Memorandum and Order, Ford's motion shall be treated as a Rule 59(e) motion. Whether relief is warranted under Rule 59(e) is a determination addressed to the sound discretion of the district judge. *Lavespere*, 910 F.2d at 174.

First, Ford contends that the court improperly relied on the Safety Act's express preemption clause to limit the scope of implied preemption. Although I considered the express language of the Safety Act in deciding the implied preemption issue, I did not base my ruling on the principle that the presence of an express preemption clause forecloses implied preemption analysis. My construction of the *Myrick* case was consistent with Ford's—that is, there is no categorical rule that implied preemption cannot exist when Congress has chosen to include an express preemption clause in a statute.[2] However, the *Myrick* court also recognized that the express language of the statute nevertheless may provide reliable indicia of con-

---

**49.** *See* legislative history to 15 U.S.C. § 1397(k), *e.g.*, "[i]t is intended that this subsection establishes that compliance with safety standards is not to be a defense **or otherwise to affect** the right of parties under common law particularly those relating to **warranty, contract, and tort liability.**" H.R.Rep. No. 1776, 89th Cong., 2d Sess. 24 (1966) U.S.Code Cong. & Admin.News 1966, p. 2709 (emphasis added).

**1.** Recodified in 1994, without substantive change, at § 30101 *et seq.*

**2.** Memorandum and Order at p. —— (citing from body of *Freightliner Corp. v. Myrick*, —— U.S. ——, —— ––––, 115 S.Ct. 1483, 1487–88, 131 L.Ed.2d 385).

gressional intent. Accordingly, I conducted an implied preemption analysis, and found that an exhaustive review of the Safety Act's language, legislative history and purpose, as well as the agency's action and inaction under the Act,[3] did not mandate preemption. I therefore reject Ford's first basis for reconsideration.

Second, Ford maintains that the court improperly viewed the agency's conduct as deferring a decision on stability issues as opposed to making a final decision subject to reconsideration in the future. Ford's arguments on this issue are repetitive of those previously urged and considered by the court. Recognizing that agency inaction in a certain area may take on the character of a ruling of nonregulation, my review of the information before me failed to persuade me that the agency's inaction took on such a character in this instance. I reject this as a basis for reconsideration, as well.

Finally, Ford urges that the court erred in its consideration of the nature of relief sought by plaintiffs. According to Ford, neither the fact that plaintiffs' allegations extend beyond the stability factor nor that plaintiffs seek money damages should have influenced the court in deciding the issue of implied preemption. However, conflict preemption analysis requires a determination of whether compliance with both state and federal law is a physical impossibility or the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress. *California Federal Savings & Loan Association v. Guerra,* 479 U.S. 272, 280, 107 S.Ct. 683, 689, 93 L.Ed.2d 613 (1987). Such a determination necessarily requires inquiry into the nature of plaintiffs' allegations and the relief sought. The court did not hold that common law actions for money damages can never pose a conflict with federal regulation; rather, I found that, on the facts of this case, the regulation and claims are not so conflicting as to indicate preemption. I decline to reconsider my previous ruling based on Ford's final argument.

In the event that the court declines to reconsider its ruling on the motion to dismiss, Ford asks the court to amend its ruling to certify its decision for immediate appeal pursuant to 28 U.S.C. § 1292(b). Section 1292(b) of Title 28 provides:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order.

Ford contends that my decision satisfies the requirements of this provision.

The Fifth Circuit strongly disfavors certification of piecemeal decisions. I am not convinced that the elements of 28 U.S.C. § 1292(b) are satisfied so as to deviate from this policy. Most significantly, I consider there to be no substantial ground for difference of opinion on the issue of law presented.

Accordingly,

IT IS ORDERED that Ford's Motion for Reconsideration is DENIED.

---

**3.** *See* Memorandum and Order at pp. 404–407.