**Betty TYLER and Lola Lister**

v.

**John Warner SMITH, Secretary, Louisiana Department of Labor, and Louisiana Department of Labor.**

**Civil Action No. 05–1040–FJP–DLD.**

United States District Court,
M.D. Louisiana.

Oct. 31, 2006.

Marcus Vise, Baton Rouge, LA, Ellen Hahn, Lafayette, LA, for Betty Tyler and Lola Lister.

Peter George Wright, Louisiana Department of Labor, Baton Rouge, LA, for John Warner Smith, Secretary, Louisiana Department of Labor, and Louisiana Department of Labor.

## RULING

POLOZOLA, District Judge.

This case requires the court to determine whether Louisiana Revised Statutes 23:1472(F)(III)(d) discriminates against disabled workers and violates the Americans with Disabilities Act ("ADA")[1] and section 504 of the Rehabilitation Act ("RA").[2]

This matter is now before the Court on the Motion to Dismiss[3] by defendants John Warner Smith, Secretary of the Department of Labor and the Louisiana Department of Labor. Plaintiffs have filed an opposition to this motion.[4]

### I. Factual & Procedural Background

Plaintiffs Betty Tyler and Lola Lister are blind disabled workers who are sometimes employed by the Louisiana Association for the Blind ("LAB"), a non-profit corporation that manufactures paper products. The LAB employees often experience temporary layoffs for lack of work. Plaintiffs filed this suit against the defendants alleging that Louisiana Revised Statutes 23: 1472(12)(F)(III)(d), which allows an exemption for sheltered workshops from the unemployment compensation statutes, discriminates against disabled workers who cannot apply for unemployment benefits in favor of non-disabled workers who are eligible to receive unemployment benefits during layoff periods. Plaintiffs argue the Louisiana statute, as applied, violates the ADA and the RA solely because of their disability.

The defendants filed a motion to dismiss plaintiffs' claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief may be granted and for failure to join a party under Rule 19 of the Federal Rules

---

1. 42 U.S.C. § 12132, *et. seq.*

2. 29 U.S.C. § 794.

3. Rec. Doc. No. 5.

4. Rec. Doc. Nos. 12 & 24.

of Civil Procedure. The Louisiana statute is taken verbatim from its federal counterpart found at 26 U.S.C. § 3309(b)(4) of the Federal Unemployment Tax Act ("FUTA").[5] The federal provision permits but does not require states to adopt this exemption. Because of the manner in which plaintiffs' complaint was worded and in accordance with Rule 24 of the Federal Rules of Civil Procedure and 28 U.S.C. § 2403(a), the Court issued a Notice to All Parties, the Attorney General of the United States, and the Attorney General of Louisiana[6] advising them that this action raised a potential constitutional challenge to federal and state statutes, since the challenged state statute draws its language verbatim from the federal statute. The Court gave the United States and the State of Louisiana the right to intervene in this action. The United States declined to intervene in this lawsuit, but submitted a Notice of Potential Interest by the United States[7] and a Statement of Interest of the United States[8] in support of the constitutionality of both the federal and state statutes involved.[9] The State of Louisiana moved to intervene[10] and filed an Intervenor Complaint.[11] A status conference was held to discuss the issues in this lawsuit. In an effort to clarify the positions of all parties, the Court, at the conclusion of the conference, ordered[12] the plaintiffs to file a response[13] to the United States' Statement of Interest, and further ordered the State of Louisiana and the United States to file a reply.[14] Based on the memoranda submitted by the parties, it is clear to the Court that plaintiffs do not challenge the constitutionality of the federal or state statutes, but do claim that the state statute, as applied, violates the ADA and the RA.

The Court now turns to a discussion of defendants' motion to dismiss.

## II. Law and Analysis

### A. Motion to Dismiss Pursuant to Rule 12(b)(6)

A motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is viewed with disfavor and is rarely granted.[15] A district court cannot dismiss a complaint, or any part of it, for failure to state a claim upon which relief can be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."[16] In reviewing a Rule 12(b)(6) motion, the Court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff.[17] In ruling on such a motion, the Court cannot look beyond the face of the pleadings.[18] The ulti-

---

5. 26 U.S.C. § 3309.

6. Rec. Doc. No. 10.

7. Rec. Doc. No. 15.

8. Rec. Doc. No. 21.

9. The United States files its memoranda pursuant to 28 U.S.C. § 517.

10. Rec. Doc. No. 18.

11. Rec. Doc. No. 20.

12. Rec. Doc. No. 23.

13. Rec. Doc. No. 24.

14. Rec. Doc. Nos. 26 & 27.

15. *Lowrey v. Texas A & M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir.1997).

16. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995).

17. *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir.1996).

18. *Baker*, 75 F.3d at 196; *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir.1999), *cert. denied*, 530 U.S. 1229, 120 S.Ct. 2659, 147 L.Ed.2d 274 (2000).

mate question in a Rule 12(b)(6) motion is whether the complaint states a valid cause of action when it is viewed in the light most favorable to the plaintiff and with every doubt resolved in favor of the plaintiff.[19] A plaintiff, however, must plead specific facts, not mere conclusory allegations, to avoid dismissal.[20]

Dismissal is warranted if a plaintiff has (1) been given the opportunity to plead his best case, (2) made specific and detailed allegations constituting his best case, and (3) still fails to state a claim.[21]

Normally, consideration of a 12(b)(6) motion focuses solely on the allegations in the complaint. However, introduction of matters of public record and entertainment of oral argument is permissible.[22] Furthermore, in deciding a 12(b)(6) motion to dismiss, a court may permissibly refer to matters of public record.[23] "When deciding a Rule 12(b)(6) motion, the Court will not consider matters outside the pleadings, except those matters of which the Court takes judicial notice."[24]

## B. Purpose of the Federal Unemployment Tax Act ("FUTA") Exemption

A brief summary of the federal-state unemployment compensation program is helpful in understanding the basis for plaintiffs' claims and defendants' motion to dismiss.

Generally, unemployed workers receive compensation through a cooperative federal-state scheme.[25] FUTA does not mandate state participation, but the Act creates incentives for states to adopt unemployment security programs that comply with minimum federal standards by providing federal grants and tax credits.[26] Through its tax, "the scheme derives funds used principally to defray administrative expenses. Through its incentives, the scheme makes it advantageous for states to impose taxes which create funds for compensation payments to employees."[27]

FUTA imposes an excise tax on total wages paid by employers. Employers are

---

**19.** *Lowrey,* 117 F.3d at 247.

**20.** *Guidry v. Bank of LaPlace,* 954 F.2d 278, 281 (5th Cir.1992).

**21.** *See Jacquez v. Procunier,* 801 F.2d 789, 792–93 (5th Cir.1986) (recognizing that dismissal is required if a plaintiff has had fair opportunity to make his case, but has failed); *Morrison v. City of Baton Rouge,* 761 F.2d 242, 246 (5th Cir.1985) (assuming that the specific allegations of the amended complaint constitute the plaintiff's best case).

**22.** *Louisiana ex rel. Guste v. United States,* 656 F.Supp. 1310, 1314 n. 6 (W.D.La.1986), *aff'd,* 832 F.2d 935 (5th Cir.1987), *cert. denied,* 485 U.S. 1033, 108 S.Ct. 1592, 99 L.Ed.2d 907 (1988) *citing* 5C Wright & Miller, Federal Practice and Procedure, §§ 1357 n. 41 and 1364, n. 24–43.

**23.** *Cinel v. Connick,* 15 F.3d 1338, 1343 n. 6 (5th Cir.), *cert. denied,* 513 U.S. 868, 115 S.Ct. 189, 130 L.Ed.2d 122(1994).

**24.** *Cousin v. Small,* 2001 WL 617455 (E.D.La. 2001) *referring to* Fed.R.Civ.P. 12(b); Fed R. Evid. 201; *see also, Cinel v. Connick,* 15 F.3d 1338, 1343 n. 6 (5th Cir.1994) ("In deciding a 12(b)(6) motion to dismiss, a court may permissibly refer to matters of public record."); *In re Ford Motor Co. Bronco II Prods. Liab. Litig.,* 909 F.Supp. 400, 403 (E.D.La.1995) ("[ T] he Court may take judicial notice of matters of public record."); *Chadwick v. Layrisson,* 1999 WL 717628, at *2 (E.D.La. Sept.13, 1999) (same).

**25.** *Ibarra v. Texas Employment Commission et al,* 823 F.2d 873 (5th Cir.1987), citing *Wimberly v. Labor & Indus. Relations Comm'n,* 479 U.S. 511, 107 S.Ct. 821, 824, 93 L.Ed.2d 909 (1987).

**26.** *Id.* at 874, citing *New Hampshire Dep't of Employment Sec. v. Marshall,* 616 F.2d 240, 241 (1st Cir.), *cert. denied,* 449 U.S. 806, 101 S.Ct. 53, 66 L.Ed.2d 10 (1980).

**27.** *Id.*

then entitled to a credit of up to 90% of their FUTA tax liability for contributions to a certified state unemployment compensation program.[28] An amount equal to the proceeds from this tax is deposited in the unemployment security administration account of the federal Unemployment Trust Fund. This fund then makes this money available to assist certified states in administering their unemployment compensation programs.[29] A state must comply with the specific requirements set forth by the Act in order to be certified.[30] It is clear that Louisiana is a certified state.

Section 3309(b)(4) of FUTA allows a state to exclude certain services from coverage required under that state's unemployment compensation program. Specifically, section 3309(b)(4) provides:

**(b) Section not to apply to certain service.**—This section shall not apply to service performed—

.     .     .     .     .

(4) in a facility conducted for the purpose of carrying out a program of—
(A) rehabilitation for individuals whose earning capacity is impaired by age or physical or mental deficiency or injury, or
(B) providing remunerative work for individuals who because of their impaired physical or mental capacity cannot be readily absorbed in the competitive labor market.

The language of Louisiana Revised Statutes 23:1472(12)(F)(III)(d) is nearly identical to the federal statute:

III. For the purposes of Subparagraphs (I) and (II) of this Paragraph

the term "employment" does not apply to service performed:

.     .     .     .     .

(d) In a facility conducted for the purpose of carrying out a program of rehabilitation for individuals whose earning capacity is impaired by age or physical or mental deficiency or injury or providing remunerative work for individuals who because of their impaired physical or mental capacity cannot be readily absorbed in the competitive labor market by an individual receiving such rehabilitation or remunerative work.

The Javits Wagner O'Day Act ("JWOD")[31] is a general federal procurement statute favoring commodities and services produced by nonprofit agencies for the blind and disabled. The JWOD Act established the Committee for Purchase from People Who Are Blind or Severely Disabled. The mission of this Committee is to provide opportunities for its clientele, which are nonprofit agencies employing the blind or severely disabled, to produce goods and services sold to the federal government.[32] The JWOD Act offers a "sheltered" environment, which permits individuals with disabilities to work for nonprofit entities such as the Louisiana Association for the Blind.[33]

The defendants, the state of Louisiana[34] and the United States, argue that by allowing states to relieve this type of charitable organization from the financial burden of contributing to or reimbursing an unemployment compensation fund to finance unemployment compensation benefits to these individuals, the statute pro-

28. *Id.* citing 26 U.S.C. §§ 3301 & 3302.

29. *Id.* (citations omitted).

30. *Id.; See* 26 U.S.C. § 3304(a).

31. 41 U.S.C. § 46, *et seq.*

32. *NISH v. Cohen,* 247 F.3d 197, 201 (4th Cir.2001)(citing *Barrier Indus., Inc. v. Eckard,* 584 F.2d 1074, 1076 (D.C.Cir.1978)).

33. *See, id.*

34. Hereinafter referred to as "Intervenor."

vides a substantial incentive for charitable organizations to offer rehabilitative services and remunerative work to disabled individuals who might be unable to obtain gainful employment elsewhere. The purpose and need for this type of exemption are not challenged by the plaintiffs.

However, plaintiffs claim that in applying the state exemption, disabled individuals working in sheltered workshops are discriminated against on the basis of their disability in violation of the ADA and the RA. It is difficult to rationalize plaintiffs' arguments that the exemptions are needed to provide jobs to disabled persons while at the same time arguing that the sheltered workshops violate the ADA and RA.

The Court now turns to a discussion of plaintiffs' specific contentions.

**C. Does the state exemption,[35] as applied, frustrate the purposes of the ADA and the RA?**

■ Plaintiffs claim they do not challenge that sheltered workshops are allowed this exemption under FUTA or Louisiana law. However, plaintiffs do contend that the state of Louisiana applies the exemption in a manner that violates both the ADA and the RA. Plaintiffs argue that FUTA does not mandate the state to grant the exemption nor does it specify the manner in which states are to discriminate between covered and non-covered employees. Since the exemption is applied on the basis of an individual's disability alone, plaintiffs contend that it frustrates the purposes of the ADA and the RA.[36]

Plaintiffs rely on the Supreme Court decision *U.S. v. Fausto*,[37] which holds that courts are to construe earlier statutes in light of later enactments. Thus, plaintiffs contend that because the ADA and the RA prohibit states from excluding individuals from their programs on the basis of disability, the FUTA exemption should be read in light of the ADA and the RA. While plaintiffs concede the ADA and RA did not implicitly or explicitly repeal FUTA, plaintiffs contend the later-enacted Acts do limit the manner in which the FUTA exemption may be applied.

In support of their motion to dismiss and in response to plaintiffs' arguments, defendants and Intervenor argue that although there are many disabled individuals who are able and available to work, many still find themselves unable to be "readily absorbed" into the competitive labor market despite the protections found in the ADA and the RA. Defendants and Intervenor contend the rights found in the ADA may and do facilitate employment but do not and cannot guarantee employment, and these sheltered workshops do operate as a safety net for those disabled individuals who cannot *readily* find work. Defendants and Intervenor also note that while federal law guarantees a person's right to be free from discrimination based on disability, federal law also permits states to shield sheltered workshops from clients' unemployment claims to protect their financial viability and their ability to hire disabled employees who may not otherwise be hired. Defendants and Intervenor state in their response:[38] "Congress de-

---

**35.** The Court will refer to the statute in Louisiana which relieves charitable organizations from the obligation of contributing to an unemployment compensation fund as the "exemption."

**36.** Plaintiffs note that the ADA not only exists to encourage employment of disabled individuals, but also to protect those individuals

from discrimination in the workplace based on their disabilities.

**37.** 484 U.S. 439, 453, 108 S.Ct. 668, 676–77, 98 L.Ed.2d 830 (1988).

**38.** In matters such as that before the Court, the Court needs to restrict its jurisdiction to deciding the case before it and not to engage in legislating from the bench. While issues

cided where to strike this balance: promoting the viability of sheltered workshop rehabilitative and remunerative services outweighed workshop clients getting an unemployment check." [39]

The United States agrees with the position taken by the defendants and the intervenor, arguing that section 3309(b)(4) does indeed share the common purpose with the ADA and the RA of encouraging employment. The United States also contends that under well established rules of statutory construction, the FUTA exemption, as a narrowly drawn specific statutory provision, takes precedence over the general statutory provisions of the ADA and RA. The United States refers the Court to the legislative history for the ADA, in which Congress expressly stated that the ADA was not intended to jeopardize or diminish the continued viability of sheltered workshops.[40]

The United States also argues that to the extent FUTA's coverage overlaps with disabled individuals, the exemption serves as part of Congress' overall effort to provide disabled individuals with greater and not less protection. The Government contends and the Court agrees that temporary unemployment benefits are poorly suited to help the disabled individuals because these benefits may expire before these individuals might find alternative employment. For this reason, the Government states that Congress has provided an alternative means of support for unemployed disabled individuals through supplemental security income ("SSI"), which is not available to non-disabled individuals under 65 years old.[41] Thus, disabled clients of sheltered workshops who become unemployed are not without a remedy, since SSI benefits are available to them based on their disabled status. Finally, the Government contends that unemployment benefits are not intended to ensure a minimum level of income nor are they intended to cover individuals with irregular employment patterns.

The Court now turns to a discussion of the jurisprudence and legislative history of the applicable statutes. In *Rojas v. Fitch*,[42] the court found that the exemptions in FUTA "facilitat[e] the administration of the federal-state unemployment insurance program by excluding from coverage a variety of workers whose employment patterns are irregular or whose wages are not easily accountable." [43]

The United States Supreme Court addressed arguments similar to those made by plaintiffs in the present case in *Traynor v. Turnage*.[44] In *Traynor*, the Court had to decide whether the language in statutes governing veterans' benefits [45] violated the

---

such as that before the Court may be somewhat debatable and not fair in the eyes of some, the solution rests in the hands of Congress rather than the pen of a judge.

**39.** Rec. Doc. No. 26, pp. 5–6.

**40.** Senate Report No. 101–116, 101st Congress, 1st Session (1989) provides: "[T]his legislation **in no way is intended to diminish the continued viability of sheltered workshops** and programs implementing the Javits–Wagner[–]O'Day Act." Sen. Rep. No. 101–116, at 30 (1989). Provisions of the ADA "should not be construed to jeopardize in any way the continued viability of ... sheltered workshops...." *Id.*, at 61. House Report 101–485, Part 2, 101st Congress, 2d Session

(1990) essentially expresses the same intent. (Emphasis supplied by the Court.)

**41.** *See* 20 C.F.R. § 416.110.

**42.** 127 F.3d 184, 188 (1st Cir.1997). The Court notes this opinion was called into doubt on other grounds by *Hardemon v. City of Boston*, 144 F.3d 24 (1st Cir.1998).

**43.** *Id.*

**44.** 485 U.S. 535, 108 S.Ct. 1372, 99 L.Ed.2d 618 (1988).

**45.** The statute defined alcoholism as "willful conduct" rather than a disability. *Id.*, at 536, 108 S.Ct. at 1375.

RA by discriminating against handicapped individuals solely on the basis of their handicap. The Court, after noting that, " 'It is always appropriate to assume that our elected representatives, like other citizens, know the law,' "[46] held:

> "It is a basic principle of statutory construction that **a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum**," unless the later statute " 'expressly contradict[s] the original act' " or unless such a construction " 'is absolutely necessary . . . in order that [the] words [of the later statute] shall have any meaning at all.' " "The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly-expressed congressional intention to the contrary, to regard each as effective."[47]

The Supreme Court's decision in *Traynor* is directly applicable to the case at bar. The Court finds that the FUTA and Louisiana statutory exemptions deal with the "narrow, precise, and specific subject" of those entities which are relieved from paying unemployment compensation insurance and further define the types of individuals and services which will qualify those entities for the exemption. Thus, the Court finds that neither FUTA nor the Louisiana statutory exemptions are "submerged" by the later-enacted ADA or RA, both of which cover "a more generalized spectrum" of discrimination.

The *Traynor* Court held that "Section 504 of the Rehabilitation Act is not violated by the VA's characterizing, for purposes of 38 U.S.C. § 1662(a)(1), petitioners' primary alcoholism as 'willful misconduct' precluding the allowance of petitioners' requested time extensions."[48] Likewise, this Court holds that the ADA and RA are not violated by FUTA's characterizing, for purposes of section 3309(b)(4), that certain disabled persons are within the category of individuals who receive services from entities which are covered by the exemption.

The Court also finds the legislative history of the ADA persuasive and supportive of its decision. Plaintiffs claim the Senate and House Reports cited by the Government do not exempt sheltered workshops from the mandates of the ADA and the RA, and that nowhere in the ADA is discrimination within these types of programs sanctioned. However, the plaintiffs' argument is clearly without merit for several reasons. First, there is no violation of the ADA and the RA, nor is there any discrimination of the plaintiffs. Under the statutory construction analysis set forth above, the narrow, specific language of the exemption which allows an individual's disability to be considered in defining the scope of coverage operates as an exception to the general provisions of the ADA and the RA. The legislative history clearly shows that Congress considered these types of programs when it enacted the ADA. Congress also believed it was important to expressly state its intentions with regard to sheltered workshops when enacting the ADA: "[T]his legislation *in no way* is intended to diminish the continued viability of sheltered workshops and programs implementing the Javits–Wagner[–]O'Day Act."[49] The Congressional re-

---

46. *Id.* at 546, 108 S.Ct. at 1380, quoting *Cannon v. University of Chicago*, 441 U.S. 677, 696–697, 99 S.Ct. 1946, 1957–1958, 60 L.Ed.2d 560 (1979).

47. *Id.* at 547–48, 108 S.Ct. at 1381–82 (internal citations omitted) (emphasis added).

48. *Id.* at 536, 108 S.Ct. at 1375.

49. S. Rpt. 101–116, at 30 (1989) (emphasis added).

port also provides that provisions of the ADA "should not be construed to jeopardize *in any way* the continued viability of ... sheltered workshops...."[50] The use of the words **"in no way"** and **"in any way"** reveal Congress' clear intent to permit Louisiana and other states to grant the exemption at issue in this case. The legislative history also establishes Congress' intent is in direct conflict with plaintiffs' argument that the ADA and the RA limit the manner in which the FUTA exemption applies to these programs. As this Court has noted earlier, the proper place for plaintiffs to present their arguments to change the system is in the halls of Congress and not the courtroom of the federal courts. The Congress has clearly spoken on this issue, the legislation is constitutional, and the legislation cannot be changed by the Court unless the Court engages in judicial legislation. This Court knows the limits of its powers granted by Article III of the Constitution and refuses to engage in legislating from the bench.

Furthermore, plaintiffs' reliance on the *Fausto* decision by the Supreme Court is misplaced under the facts of this case. While it is true that the "classic judicial task of reconciling many laws enacted over time, and getting them to 'make sense' in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute,"[51] such a reconciliation is not necessary in this case because the statutes involved in this case already "make sense" when read together. The conflicts were carefully considered and discussed by the Congress when it enacted the legislation. It is clear to the Court that the FUTA and Louisiana exemptions, the ADA, and the RA work together both in language and actual application to promote the employment and protection of disabled individuals who might not easily obtain employment in the competitive labor force. While plaintiffs may disagree with the method chosen by the Congress to protect these disabled workers, such disagreement does not give this Court the power to grant the relief they seek.

Finally, the Court agrees with the United States that plaintiffs receive greater protection through available SSI benefits since unemployment compensation benefits are temporary and could expire prior to plaintiffs' obtaining subsequent employment. Thus, if the exemption is discriminatory in any way, the Court finds that it is discriminatory in favor of the plaintiffs.[52]

Therefore, the Court finds that the state exemption, as applied under the facts of this case, does not frustrate the purposes of the ADA and the RA. The Court also finds that the ADA and RA do not limit the manner in which the exemption may be applied under the facts of this case.

**D. Does the state exemption, as applied, determine eligibility to receive unemployment compensation benefits based solely on an employee's disability?**

Plaintiffs contend that Louisiana applies the exemption based on an individual's disabled status alone when determining eligibility to receive unemployment compensation benefits. Plaintiffs argue that by solely using an employee's disabled status in this determination, the state violates the ADA and the RA. Plaintiffs also state in their First Amended Complaint

---

**50.** *Id.,* at 61 (emphasis added).

**51.** *U.S. v. Fausto,* 484 U.S. at 453, 108 S.Ct. at 676–77.

**52.** As this Court has noted earlier in this opinion, if plaintiffs are not satisfied with the benefit plan established by the Congress, plaintiffs should ask the Congress to change the system.

that they "are not receiving rehabilitation services from LAB. They are employees."[53] Plaintiffs' arguments are without merit.

Defendants, Intervenor, and the United States correctly argue the plaintiffs mischaracterize the basis for coverage as being one of disability. These same parties also argue that the basis for coverage under the exemption is *not* disability status but rather an individual's status as the client of a non-profit sheltered workshop. The Court agrees. The United States notes that the exemption covers a wide variety of individuals, and section 3309(b)(4) does not limit coverage simply upon a finding of "disability." The United States also correctly states and the Court so finds that simply because an individual is receiving rehabilitation or remunerative work in a sheltered workshop does not necessarily mean that such an individual would also be considered "disabled" under either the ADA or RA. In fact, the United States contends it is unlikely that all individuals employed at a sheltered workshop would have a claim under the ADA or RA, because they are not required to have a disability to be a client of a sheltered workshop.

The Court finds that disability status is not the determinative factor for exemption coverage under the statute. Clearly, it is an individual's status as a client of a sheltered workshop which triggers the exemption. In defining what types of facilities are covered by the exemption, both the federal and state statutes refer to an individual's "impaired physical or mental capacity" as simply one category of individuals who may be clients in a covered facility.[54]

Plaintiffs rely on *Olmstead v. L.C. ex rel. Zimring*[55] to support their arguments. In *Olmstead*, the Supreme Court addressed a challenge under the ADA to the state of Georgia's implementation policy with regard to the confinement of mentally disabled patients in a segregated environment. Unlike the Louisiana exemption statute, the Georgia policy was not based on, or drawn verbatim from, any corresponding federal statute. Furthermore, the Court addressed the competing interests of the ADA and the RA against the state's policy and manner of providing services to mentally disabled persons.

In *Olmstead*, the Attorney General of Georgia had concluded that under the ADA, the "unjustified placement or retention of persons in institutions, severely limiting their exposure to the outside community, constitutes a form of discrimination based on disability prohibited by Title II."[56] However, with regard to states' obligation to avoid unjustified isolation of individuals with disabilities, "the Attorney General provided that States could resist modifications that 'would fundamentally alter the nature of the service, program, or activity.'"[57] This reasonable-modifications

---

**53.** Rec. Doc. No. 28–2, p. 3, ¶ 12. The Court notes that the statute clearly covers those entities "conducted for the purpose of carrying out a program of . . . rehabilitation . . ., *or* providing remunerative work" for individuals such as the plaintiffs. Plaintiffs cannot dispute that LAB provides them and they perform remunerative work; thus, the fact that plaintiffs do not classify their relationship with LAB as rehabilitation is completely irrelevant since it is not the only category of services covered in the exemption.

**54.** 26 U.S.C. § 3309(b)(4) & La. R.S. 23:1472(12)(F)(III)(d).

**55.** 527 U.S. 581, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999).

**56.** *Olmstead*, 527 U.S. at 596, 119 S.Ct. at 2185 (citations omitted).

**57.** *Id.* at 597, 119 S.Ct. at 2185, *quoting* 28 C.F.R. § 35.130(b)(7) (1998).

regulation permitted a cost-based defense. Thus, the Supreme Court had to determine whether Georgia's cost-based defense allowed it to continue its own procedures even if it would constitute the "unnecessary segregation of persons with disabilities" as set forth in the ADA.

In the present case, there are no competing interests among the federal and state statutes involved. It is clear that the provisions of FUTA, the ADA, and the RA are entirely consistent and share the common goal of promoting employment of the disabled. In fact, the Court believes if plaintiffs prevail on their claims, many sheltered workshops such as LAB would lose the financial incentive to employ the type of individuals covered under the exemption. Thus, the Court believes it is the relief sought by plaintiffs that would frustrate the purpose of the ADA and the RA and ultimately result in the decline of employment opportunities available to the plaintiffs and other individuals as defined in the statutory exemption. This is certainly not the intended effect of the ADA or the RA, or the intent of the Congress as expressed in the legislative history. Therefore, the Court will not interpret the provisions at issue in such a way that would ultimately harm the plaintiffs and others similarly situated who are not involved in this litigation with regard to employment opportunities.

### E. Does the ADA and/or RA require that disabled sheltered workshop clients receive individual assessments before the denial of unemployment compensation benefits?

Maintaining their position that the later-enacted ADA and RA limit the manner in which the FUTA exemption can be applied, plaintiffs also claim that as disabled clients of sheltered workshops, they are entitled to an individual assessment determining whether they are "unable to be readily absorbed into the workforce." Plaintiffs also challenge the notion that if an employee of a sheltered workshop has a disability, this employee is automatically deemed "unable to be readily absorbed into the workforce," and thus excluded from participation in an unemployment compensation system.[58] Plaintiffs claim that since the FUTA was passed before the ADA was contemplated, the exemption in section 3309(b)(4) and the state counterpart must be construed in light of the ADA. This, according to plaintiffs, would require an individualized determination that an employee of a sheltered workshop cannot be absorbed in the workplace, even with reasonable accommodations, before allowing the state's unemployment system to exclude the individual.[59] Unfortunately, this is not what the Congress intended when the various acts were enacted.

Defendants and Intervenor argue that plaintiffs already have a right to individualized determinations based on their individual circumstances under existing Louisiana employment law.[60] They further

---

**58.** Rec. Doc. No. 24, p. 5.

**59.** Plaintiffs argue that if some disabled individuals can be absorbed into the labor market, it does not frustrate the purpose behind the exemption to allow them to collect unemployment benefits when they are unable to find work.

**60.** Louisiana Revised Statutes 23:1624–1634: An agency must make an initial determination of claimant's eligibility. § 1624. Claimants

then have a year to seek redetermination of the agency finding. § 1626. Claimants may appeal agency determinations to an appeal referee, who must notice and conduct a hearing, make factual findings and conclusions, and decide to affirm, modify, or reverse the agency determination. § 1629. This decision is appealable to the Board of Review. § 1632. Thereafter, review is available in state district court, appellate court, and ultimately the Louisiana Supreme Court. § 1634.

contend that Louisiana unemployment law affords more levels of individualized review than an ordinary civil litigant possesses.[61]

The United States also contends that neither the ADA nor the RA require individualized assessments to determine coverage under Section 3309(b)(4) of FUTA. While the United States concedes that the ADA and RA require individualized assessments of "disability" for purposes of bringing claims under those particular statutes, the United States argues that it does not follow that those statutes, simply by their enactment, now require the United States to conduct individualized assessments to determine whether an individual falls within the scope of the section 3309(b)(4) exemption or its state counterpart. The United States challenges plaintiffs' contentions on several grounds.

First, the United States argues that it is unlikely that all individuals working at a sheltered workshop would have a claim under the ADA or the RA because a client of a sheltered workshop is not required to have a disability. Second, the United States contends that the proper standard to be utilized is not whether an individual "can be absorbed into the workplace," as framed by the plaintiffs, but whether an individual either "cannot be *readily* absorbed in the *competitive* labor market," [62] or has an impaired learning capacity. The United States further contends that by attempting to narrow the exemption, plaintiffs seek to expand the scope of mandatory unemployment coverage beyond the limits established under FUTA.[63]

For the reasons set forth in section II(C) of this opinion, the Court finds that the Louisiana statutory exemption is not limited in its application by the ADA and RA. The Court has earlier held that the purposes of the statutes are consistent without the need to construe the FUTA exemption in light of the ADA and the RA. The Court has also determined that Congress was clear in its intent that the ADA was not to affect the viability of sheltered workshops "in any way." Thus, unless the Court wants to engage in judicial legislation, the Court cannot hold that the ADA and RA require individual assessments in the determination of the application of unemployment compensation exemption coverage. Such a holding would clearly affect the viability of sheltered workshops in contravention of the express intent of Congress.

## III. Conclusion

For the reasons set forth above, the Court finds that plaintiffs have failed to state a claim upon which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Therefore, defendants' motion to dismiss under Rule

**61.** Plaintiffs' First Amended Complaint (Rec. Doc. No. 28–2) indicates that plaintiffs have filed claims for unemployment benefits from the Louisiana Department of Labor, and these claims were denied allegedly based on plaintiffs' disabilities. Plaintiff Lola Lister appealed the agency decision, and this decision was affirmed. Further, the fact that plaintiffs may or may not be ultimately successful in the state review process is not relevant to the Court's determination that the ADA and RA do not require "individual assessments" in the application of the statutory exemption set forth in the federal and state unemployment compensation statutes. However, it is interesting to note that while plaintiffs seek to strike the current exemption because they argue it does not provide an individual assessment, the plaintiffs do not fully avail themselves of the existing acts which provide for individual assessments and appeals as set forth in n. 60 of this opinion.

**62.** Rec. Doc. No. 27 (emphasis in original).

**63.** Not only does plaintiffs' argument extend the unemployment coverage beyond the limits established under FUTA, but it also conflicts with Congress' intent when it enacted the various programs.

12(b)(6) is granted, and plaintiffs' claims are dismissed with prejudice. Defendants' motion to dismiss for failure to join a party under Rule 19 is denied as moot.[64]

Judgment shall be entered accordingly.

---

**64.** The Court has considered all arguments of counsel whether specifically addressed herein or not.